UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS



```
)
D.H. PIERCE DESIGN ASSOCIATES,        )
INC., d/b/a PIERCE ARCHITECTS,        )
        Plaintiff,                    )
                                      )
                                      )
v.                                    )    DOCKET NO:
                                      )
D.L. COTE & COMPANY, LLC, and DEE     )
L. COTE, in his Individual Capacity,  )    05 - 11C26 RWZ
        Defendants.                   )
                                      )
```

## MOTION FOR PRELIMINARY INJUNCTION OF
## PLAINTIFF D.H. PIERCE DESIGN ASSOCIATES, INC.

Now comes the plaintiff D.H. Pierce Design Associates, Inc. ("Pierce") and,

pursuant to Fed.R.Civ.P. Rule 65 and the Local Rules of this Court, hereby moves for a

preliminary injunction enjoining the defendants, D.L. Cote & Company, LLC, and Dee L.

Cote (collectively "Cote"), from using any of Pierce's Drawings[1] prepared in connection

with the building known as The Leavitt House Condominiums located at 7 Winter Street

in Salem, Massachusetts (the "Project"), for any purpose, including, but not limited to

marketing, promotional materials, and construction. In support, Pierce states as follows:

## I.    Relevant Facts

1.      On December 4, 2003, to induce Pierce to perform services and enter into
a contract with Cote, Cote executed a promissory note in favor of Pierce calling for
payment of $5,000.00 to Pierce, above and beyond any other compensation due Pierce for
work on the Project, at the earlier of completion of the Project or December 1, 2004. *See*
**Exhibit 1** to the Affidavit of Daniel H. Pierce.[2]

---

[1]      Including but not limited to, all plans, specifications, designs, drawings, or sketches, whether
provided in printed or electronic form.

[2]      References to exhibits hereinafter are to the exhibits appended to the affidavit of Daniel H. Pierce.

2.       On March 5, 2004, Pierce entered into a Standard Form of Agreement Between Owner and Architect (the "Contract") with Cote in connection with the Project. **Exhibit 2**.

3.       The Contract provided that Pierce would prepare original architectural Drawings for the Project to accommodate renovations, additions and new construction. **Exhibit 2**, Article 1.

4.       As published in the Contract, Pierce advised Cote, and Cote agreed, that Pierce retained all rights in the Drawings specifically, all common law and statutory rights, including copyright; accordingly, Cote has no independent rights to Pierce's original architectural Drawings. **Exhibit 2**, Article 3.

5.       On August 5, 2004, Pierce and Cote entered into a written Memorandum of Understanding ("MOU") providing for changes and additions to the payment terms for Pierce's services under the Contract. Specifically, the MOU provided that in addition to monies already due and owing to Pierce, for services rendered by Pierce through March 1, 2005, Pierce would be paid $75,000, which would be due at the earlier of June 1, 2005, or sale of the fifth condominium unit at the Project. **Exhibit 3**. [3]

6.       On March 31, 2005, prior to the completion of the Project, Cote terminated the Contract without cause. **Exhibit 4**.

7.       Despite demand, Cote has refused to make payment to Pierce for services rendered, and as called for under the Promissory Note, Contract, and MOU. Affidavit of Daniel H. Pierce, paragraphs 8-9.

8.       After Pierce's termination, Cote was expressly advised that Pierce was not relinquishing its ownership or copyright in the Drawings, and that any permission Cote may have had to use those Drawings was revoked. **Exhibit 5**.

9.       Despite being advised that he had no right to use the Drawings, Cote continued to use them following termination of the Contract to complete construction of the Project, including, at a minimum, directing another architect to use Pierce's Drawings in connection with the Project. **Exhibit 6**.

10.      Additionally, Cote has continued to use Pierce's Drawings in the promotion and marketing of the Project. On April 5, 2005, Cote directed the duplication of a CD containing copyright protected Drawings prepared by Pierce. **Exhibit 9**. Moreover, Cote continues to use and publish those Drawings as part of his marketing of the Project. A true and accurate copy of materials taken from the web page for the Project, http://www.leavitthouse.com, is appended hereto as **Exhibit 11**.

---

[3]      The payment parameters and the scope of the services defined in the Contract were altered on two occasions. On June 8, 2004, the scope of the services was amended by an Additional Services Agreement, signed by Cote, and on August 5, 2004, the payment parameters were restructured in the MOU. However, the copyright protections delineated in the original Contract were never altered.

2

## II.    Argument

For purposes of preliminary injunction, the public interest is always served by upholding copyrights and thereby encouraging individual effort and creativity. Janel Russell Designs, Inv. v. Mendelson & Associates, 114 F.Supp.2d 856, 863 (D.Min. 2000). Similarly, there is a presumption of irreparable harm in any violation of copyright protected work. Concrete Machinery Company v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611 (1st Cir. 1988). *See also*, Value Group, Inc. v. Mendham Lakes Estates, L.P., 800 F.Supp. 1228, (D.N.J. 1992)(restraining order granted preventing construction of building using copied architectural plans due to presumption of actual harm). All that is needed for the issuance of a preliminary injunction in a claim for violation of copyright is for the plaintiff to prove a likelihood of success on the merits of **that claim**. Concrete Machinery Company v. Classic Lawn Ornaments, Inc., 843 F.2d at 605.

To establish a likelihood of success on its claim of copyright infringement, Pierce needs only show that its has (1) ownership of a valid copyright and (2) there has been copying of constituent elements of its work that are original.    Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991). If Pierce can demonstrate that it owns the copyright to the Drawings (and has not granted Cote permission to use them), and that Cote has copied or used Pierce's designs, a violation of copyright has occurred. As Pierce is able to show such a likelihood of success in establishing all of the elements of its claim, the preliminary injunction sought must be granted.

### A.    The Drawings are Pierce's Original Work.

As established by the Architectural Works Copyright Protection Act, original architectural drawings are automatically and expressly protected under the Federal

3

copyright laws. 17 U.S.C. § 102. As a matter of law, work possessing even the slightest amount of creativity, no matter how crude or humble, is deemed protected by copyright. Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. at 345 (1991). As this Court has noted, the requisite level of creativity [for copyright protection] is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be. John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F. Supp. 2d 1, 10 (D.Mass. 2002), *quoting* Feist Publications, Inc., 499 U.S. at 345.

In this case, the Drawings are Pierce's representation of the design process which it performed for the Project pursuant the Contract. The Drawings are not copies of other works. Rather, they are the plans, specifications, and renderings for the conversion of the Project into individual residential units. The Drawings show both the creative plan prepared by Pierce, as well as the technical requirements reflecting the professional services performed by Pierce for the Project. As such, they are deemed original works for the purpose of copyright protection under 17 U.S.C. § 102.

**B.    Pierce Owns the Copyright to the Drawings.**

Legal ownership of copyright in a work "vests initially in the author or authors of the work." 17 U.S.C. § 102(a). In this case, that is Pierce. Moreover, the parties contractually agreed that Pierce retains ownership of all statutory and common law rights to the use of the Documents, including copyright.[4] **Exhibit 2**, Article 3. Accordingly, there can be no dispute that Pierce controls all rights to the use of the Drawings.

---

[4]    Pierce has indicated he is the copyright holder on all Drawings, and has also registered the Drawings with the Library of Congress as his copyright protected works. Pursuant to Federal copyright regulations, Pierce's Drawings were deemed registered upon the mailing of Form VA(2) to United States Copyright Office on April 12, 2005. **Exhibit 8**.

4

## C.     The Drawings were Copied.

"The question whether the defendant in an infringement action 'copied' the work of the plaintiff is ordinarily one of the most intractable problems in copyright cases." John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F. Supp. 2d 1, 13 (D. Mass. 2002).   However, that is not the case in this matter.   Rather, the undisputed evidence in this case establishes the actual copying and continued use of the Drawings by and at the direction of Cote.[5]

In addressing whether the Drawings were copied, this Court has previously stated that "a picture is worth a thousand words." John G. Danielson v. Winchester-Conant Properties, 186 F.Supp.2d 1, 14 (2002). In order to find that copying has occurred for the purpose of a copyright violation (and specifically for the issuance of a preliminary injunction), the Court applies the "ordinary observer" test to determine if the allegedly offending material is "substantially similar" to the copyrighted designs.    Concrete Machinery Company v. Classic Lawn Ornaments, Inc., 843 F.2d at 606.   In John G. Danielson, the Court simply compared the original drawings to those being used by the defendant and found that but for the removal of references to the plaintiff they were virtually, if not entirely identical.  John G. Danielson v. Winchester-Conant Properties, 186 F.Supp.2d at 14.  The same is true in this case.

---

[5]        To the extent that Cote may argue that it did not copy the Drawings itself, that is of no legal consequence. As this Court said, quoting the Second Circuit in Lipton v. Nature Co., 71 F.3d 464, 471 (2d Cir. 1995), "copying from a third source wrongfully copied from the plaintiff, without knowledge that the third source was infringing, does not absolve a defendant of liability for copyright infringement." John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F. Supp. 2d at 13-14. Here, Cote both used Drawings on file with the local building department without permission and directed others to copy Pierce Drawings, both violations of Pierce's copyright in those materials.

5

### 1.   Cote used Pierce's Drawings to complete the Project.

On March 31, 2005, Cote terminated Pierce by advising Pierce that its services "are no longer desired." **Exhibit 4**. At that time, the Project was not yet completed. Accordingly, Cote retained another architect, H.H. Morant &Co., Inc. ("Morant") to complete the Project.

Cote told Morant that Pierce's Drawings had been released for their use. **Exhibit 6**. Thereafter, Morant completed the Project using Pierce's Drawings. Morant confirmed this to the City of Salem, expressly advising the Salem Building Inspector that it did not prepare any new designs or calculations in completing the Project. **Exhibit 7**. Rather, the design documents on file with the City of Salem, which were the materials used to complete the Project, were Pierce's Drawings. **Exhibit 13**. As such, it is clear that after terminating Pierce's services for his own convenience, Cote (or his agents at his direction) used Pierce's Drawings to complete the Project, without Pierce's permission, and without compensating Pierce for continued use of the Drawings without Pierce's continued involvement in the Project.

### 2.   Cote continues to copy and use Pierce's Drawings.

As Pierce required a number of hard copies of his computerized Drawings during the Project, it provided an electronic version of those Drawings to a third party printing company, Joseph Merritt & Company ("Merritt"). At no time did Pierce provide Merritt with any authorization to copy or distribute the Drawings to third parties without his approval. Instead, Merritt was to serve as a repository for the Drawings in case further hard copies were needed.

6

967593v1

Almost immediately after terminating Pierce's services, Cote contacted Merritt and directed them to provide copies of the Drawings to Leighton O'Connor, principal of a marketing and web design company ("Leighton"). Merritt agreed to provide the requested materials to Leighton "because the owner of the project was requesting them." **Exhibit 6**. Cote issued this directive to Merritt despite receiving prior correspondence from Pierce advising that if Pierce's Contract were terminated prior to the completion of the Project, the Drawings could not be used without Pierce's authorization. **Exhibit 10**.

Moreover, even after completion of construction, Cote continues to use Pierce's Drawings as part of the marketing for the sale of condominium units. As part of the web site for the Project, Cote has included architectural designs which are part of the Drawings. **Exhibit 11**. At no time has Pierce provided authorization for such use of its copyright protected materials.[6]

### D.    Cote Had No Right to Continue to Use Pierce's Drawings

It is expected that Cote will argue that he did not violate Pierce's copyright in the Drawings as he had a license to use those Drawings from Pierce. As noted above, the Contract expressly reserved all rights in the Drawings to Pierce. **Exhibit 2**. Moreover, all correspondence between Pierce and Cote indicates that Pierce granted Cote a non-exclusive license to use the Drawings only while Pierce was engaged as the Project architect. However, Cote elected to terminate that relationship for its own convenience. Accordingly, for Cote not to have violated Pierce's copyright, it must have also had an "implied license" to use the Drawings without Pierce's continued involvement in the Project or its permission. But the documented dealings between the parties expressly

---

[6]    In fact, Cote even continues to use Pierce's name to market the sale of units at the Project, identifying Pierce on his web site as being part of the Leavitt House Design Team. **Exhibit 11**.

967593v1

refuse such an assertion. Moreover, given the facts of this case, the imputation of such an implied license would be contrary to public policy.

### 1. No license was given for use of the Drawings without involvement by, or compensation to, Pierce.

As set forth in Article 1 and Exhibit 1 to the Contract, Pierce's services on the Project extended from initial design through completion of Construction. **Exhibit 2**. Similarly, unlike most contracts of this nature, this Contract did not provide Cote or Pierce with an option to terminate Pierce's services for convenience. Rather, the Contract expressly provides that the only circumstance under which Pierce could cease performance is if either party substantially fails to perform in accordance with the terms of the Contract. **Exhibit 2**, Article 4. Therefore, looking at the plain language of the fully integrated contract between the parties, absent a default under the Contract, it was the intention of the parties that Pierce was to remain on the Project through completion.

Given this intent, there is no Contract provision addressing the continued use of Pierce's Drawings under the circumstances in this case, *i.e.* termination of Pierce's services solely for Cote's convenience. However, the Contract does address the issue of use of the Drawings during the only time the parties contemplated that Pierce would not be involved in the Project absent a default, *i.e.* after the Project was completed. In that circumstance, the Contract expressly provides that there can be no such use without Pierce's written approval. **Exhibit 2**, Article 3 and Exhibit 3 paragraph 1.4.

Moreover, the communications exchanged between the parties regarding the use of the Drawings should the Contract be terminated (for cause or otherwise) demonstrate that there was never intended to be a license granted for Cote's use of the Drawings under those circumstances. On September 30, 2004, 6 months before Cote's termination of the

8

Contract, Pierce gave Cote a written notice of its intent to terminate the Contract for cause due to non-payment. In that notice, Pierce expressly stated its understanding that in the event the Contract were terminated, the Drawings were Pierce's property, and thus Cote could not continue to use them without Pierce's permission. **Exhibit 10**. Pierce went so far as to state that it would consider any such use to be "a violation of both the Agreement and our statutory rights to those materials."

Similarly, Pierce reiterated this position following Cote's termination of the Contract. On April 7, 2005, Pierce wrote to Cote advising:

> While not acknowledging any right or ability on the part of D.L. Cote & Company LLC to terminate the Standard Form of Agreement Between Owner and Architect for a small project dated 5 march 2004 (the "Agreement"), this is to remind you that any right or permission you may have had with respect to the use of any design documents prepared by Pierce Architects or its consultants was solely pursuant to the terms of that Agreement. As you have unilaterally elected to terminate the agreement, without cause, your ability to use any design documents prepared by Pierce Architects or its consultants has also been terminated. Therefore, any continued use of those materials is a violation of the Federal copyright held by Pierce Architects on such materials, and Pierce Architects does not waive such rights or grant permission of any type for continued use of those materials.

**Exhibit 5**. Accordingly, both before and after Cote's termination of Pierce's services, Pierce consistently advised that it was unwilling to allow Cote to continue to use the Drawings if the Contract was terminated.

Cote has no contractual right to a license to the Drawings. As such, any license, and the terms thereof, are dictated by Pierce. And to determine such terms, the Court looks to the totality of the parties' conduct. John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F. Supp. 2d at 18. In this case, that conduct demonstrates that no license was intended to be granted for use of the Drawings without Pierce's continued involvement in the Project.

9

The facts in this matter are similar to another case to which this Court has cited as authoritative on the subject, Johnson v. Jones, 149 F.3d 494 (6th Cir. 1998). In the Johnson case, an architect prepared plans for a residence at the direction of a client. However, the architect and client could not come to terms on a contract. Thus, the client terminated the architect's services. The client nevertheless used the architect's plans, obtained from the building department, to construct the residence. The court, looking at the dealings between the parties, found that such action was a violation of the architect's copyright and that no license to use the plans could be implied. Id. at p. 500. The facts in this case are even more compelling in favor of Pierce.

Like the architect in Johnson, who expressed an unwillingness during contract negotiations to allow his plans to be used without his involvement in the project, Pierce expressly advised Cote in writing that it would not give Cote permission to use the Drawings should the Contract be terminated. **Exhibits 5** and **10**. Similarly, like the architect in Johnson, Cote's replacement architect obtained Pierce's plans not from Pierce, but rather from a his client and/or a third party without Pierce's knowledge. Given these facts, this Court has ample evidence to show that "[Pierce] would not have allowed [Cote] to finish the project using his drawings without a written agreement, and additional compensation." Id. Moreover, there are additional factors present in this case which compel such a finding.

Unlike the architect in Johnson, Cote and Pierce did enter into a Contract. That Contract establishes certain facts which were only implied in Johnson. For example, the court in Johnson found that negotiations in that case implied that the architect would be in charge of the project. In this case, that fact is contractually established (as Pierce could

967593v1

10

only be terminated for cause). Similarly, the Johnson court had to infer the intent of the

parties as to the right of ownership in the documents based on their contract negotiations.

In this case, the Contract expressly provided Cote's agreement that the Drawings were

and remained the property of Pierce. Accordingly, as in Johnson, "almost every objective

fact points away from the existence of an implied license" under these circumstances.

### 2.    Public policy dictates that no license should be inferred.

As noted above, at issue is Cote's continued use of Pierce's Drawings under

circumstances not contemplated by the parties' Contract; termination of Pierce's services

by Cote, solely for Cote's convenience, and prior to payment to Pierce pursuant to the

terms of the written Contract and additional executed agreements. Accordingly, as in the

Johnson case, this matter concerns more than the lack of compensation paid to Pierce; it

also involves the way Pierce's drawings were used.

It is one thing for an architect to allow the owner to hire someone else to build a
house from the architect's plans. It is quite another for the architect to allow a
competitor to come in and claim the architect's work as his own. Put simply, [the
architect's] drawings were used in a way he never intended – *i.e.,* a rival architect
claimed them as his own and completed the [project] without the [original
architect's] involvement.

Id. at 501. Essentially, the same thing occurred here. Pierce prepared Drawings based on

an understanding he would be involved in the Project through completion. After

preparing the documents necessary to complete the Project, Pierce was terminated,

without cause, and another architect completed the Project using Pierce's designs.

As noted above, public policy favors the enforcement of copyright. In this case,

Pierce did everything possible to protect his copyright in the Drawings. It contractually

reserved all such rights in the Drawings to itself, placed notice of its copyright on the

Drawings themselves to warn others of this right, and expressly advised Cote prior to

11

967593v1

termination of the Contract that the Drawings were copyright protected and could not be used if the Contract were terminated.

Moreover, Pierce performed all of its duties under the Contract. It provided the Drawings, reviewed and commented on submittals, and performed observation services in a timely fashion to permit construction. Pierce even agreed to defer its compensation to allow Cote more capital to develop the Project. And in response, Cote elected to terminate Pierce's services at the time the MOU provided Pierce was to begin receiving additional compensation on an hourly basis for its services. **Exhibit 3**.

Finally, it is worth noting that while Pierce was precluded from continuing to perform services in connection with the completion of the Project, that did not end Pierce's potential liability associated with the Project. As the architect of record whose Drawings are on file with the Building Department and were used to complete construction, Pierce is subject to claims associated with any purported defect in construction of the Project. At least for the applicable period of repose, Pierce is potentially subject to legal claims for personal injury or property damage associated with defects in the Project. Pierce remains subject to the liabilities associated with being the Project architect without either the ability to protect its interests (in the form of providing construction observation services to make sure its designs were properly constructed) or benefit (namely compensation for its services), something no reasonable design professional would permit.

To allow Cote the continued use of the Drawings under an implied license in these circumstances would effectively negate any copyright protection afforded under the law. The effect would be to permit project owners to obtain copyright protected

materials, use them to complete their projects without paying for them, and then force the copyright holder to pursue a claim. It would also expose design professionals to potential liability which they were powerless to protect against. As such action is contrary to public policy in general, and the purpose of the copyright statute in particular, Cote should not be deemed to have an implied license to use Pierce's Drawings following Cote's decision to terminate the Contract.

## D.    Contract Based Claims.

Finally, to the extent this Court deems it necessary to examine the breach of contract based claims which are in dispute, Pierce notes that this is a simple matter. The payment of fees is dictated by a stipulated amount expressed clearly in the Promissory Note and the Agreements. The language of the relevant documents regarding such payment obligation is clear and without ambiguity. As such, extrinsic evidence as to its meaning is unnecessary and, indeed, inadmissible because such evidence could serve only to contradict, vary, or broaden an otherwise clear agreement. Kobayashi v. Orion Ventures, Inc., 42 Mass.App.Ct. 492, 496 (1997), *citing* Gifford v. Gifford, 354 Mass. 247, 249 (1968).

Pierce sent Cote an invoice identifying the services performed, the time expended, and the expenses incurred, all in conformance with the Agreements. A true and accurate copy of Pierce's Invoice is appended hereto as **Exhibit 14**. Cote has never expressed any dissatisfaction with Pierce's services, and terminated the Contract simply because it no longer "desired" Pierce's services. **Exhibit 4**. Moreover, Cote has never asserted that the amount sought by Pierce was more than originally agreed. To the contrary, had Pierce been paid on an hourly basis, the charge for its services would have equaled or

13

967593v1

exceeded the stipulated sum called for in the Contract. Affidavit of Daniel H. Pierce, paragraph 10. Accordingly, Cote has no basis for refusing to make the payments called for in the Promissory Note and the Agreements.

Similarly, Cote can not offer an "excuse" for his conduct with respect to the contractual breach relating to the ownership of Pierce's Drawings. If Cote wanted to obtain any legal rights in Pierce's Drawings, Cote should not have agreed to a Contract which vested all legal rights in the Drawings with Pierce. Moreover, Cote could have negotiated the continued use of the Drawings through a separate agreement with Pierce; one which provides for proper compensation and liability protection commensurate with such use. Cote did not.

It seems almost self-evident that Cote's actions are a breach of contract. Cote contracted with Pierce to prepare the Drawings and then terminated Pierce, refused to pay Pierce, copied the Drawings in violation of copyright, and then continued to use the Drawings in marketing, selling and finalizing construction for the Project. Under those circumstances, it is more than likely that Pierce will succeed on the merits of all of its claims.

**III.    Conclusion**

As established above, the Drawings represent Pierce's original design work which is protected by copyright pursuant to the Architectural Works Copyright Protection Act, amending 17 U.S.C. § 102. Pierce neither transferred that copyright to Cote, nor provided Cote with a license to use the Drawings in the event that the Contract were terminated. Yet, Cote elected to terminate the Contract in violation of its terms, complete the Project and market it for sale using Pierce's Drawings without permission, and refuse

14

967593v1

to make payment to Pierce of amounts contractually agreed upon and owing. As such action is presumed to cause irreparable harm, and as Pierce is reasonably likely to succeed on the merit of his claim for copyright violation. Accordingly, this Court should issue a preliminary injunction precluding Cote from any further use of the Drawings in any manner, including, but not limited to, further construction on the Project, further submissions to governmental or regulatory agencies, further filings of condominium or other ownership rights, and further marketing of the Project, as well as precluding Cote from relying upon any prior submission of the Drawings to any governmental, regulatory, or other administrative body to obtain further permits, approvals or certificates of completion or occupancy.

Respectfully submitted
D.H. PIERCE DESIGN ASSOCIATES, INC.
By its attorneys,
MORRISON MAHONEY LLP

Steven J. Bolotin, BBO#564085
250 Summer Street
Boston, MA 02210
(617) 439-7500